In re MJK CLEARING, INC., Debtor.

Maple Securities U.S.A. Inc., Plaintiff,

v.

James P. Stephenson, Trustee,
Advanced Clearing, Inc.,
Defendants.

Adversary Nos. 01–4257, 01–4283.

United States Bankruptcy Court,
D. Minnesota.

Sept. 11, 2002.

Stephen M. Mertz, Ted R. Cheesebrough, Minneapolis, MN, for Stephenson.

Steven J. Heim, for plaintiff.

### MEMORANDUM ORDER GRANTING SUMMARY JUDGMENT

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for hearing on the Motion for Summary Judgment of defendant James P. Stephenson. Stephen M. Mertz and Ted R. Cheesebrough appeared for Stephenson. Steven J. Heim appeared for the plaintiff.

This court has jurisdiction over this matter pursuant to the Securities Investors Protection Act of 1970 and in particular the Protective Decree entered against the debtor under 15 U.S.C. § 78eee(b), as well as under 15 U.S.C. §§ 78eee(b)(2), 78eee(b)(4), and 28 U.S.C. §§ 1331 and 1332.

### THE PARTIES

The plaintiff, Maple Securities U.S.A., Inc., is a Delaware corporation and a registered broker-dealer with the Securities and Exchange Commission. The debtor, formerly known as Miller Johnson & Kuehn, is a corporation organized under the laws of Minnesota with its principal place of business in Golden Valley, Minnesota. The debtor, until it suspended business activities on September 25, 2001, was engaged in the business of securities brokerage and trading. Defendant Advanced Clearing, Inc., now known as Ameritrade, is a Nebraska corporation and a registered broker-dealer with the Securities and Ex-

change Commission.[1]

Maple and MJK entered into a Master Securities Loan Agreement dated July 15, 1999. The agreement has been amended from time to time. Pursuant to the MSLA, if one party borrowed securities from the other, the borrower would deposit with the lender cash or other collateral in an amount equal to at least one hundred percent of the market value of the loaned securities. The lender would pay the borrower a cash collateral fee for any cash given as collateral for loaned securities at a rate agreed between the parties, and would hold that collateral as security for the borrower's obligations with respect to the loan. Moreover, the MSLA provided that if the value of the securities increased in the market, the borrower would provide additional cash collateral to the lender. Conversely, if the value of the securities decreased, the stock lender would return the amount of the decrease. This process is known as "marking to market," which serves to equalize the value of the securities and the cash collateral. Under the MSLA each party could act as both a lender and a borrower of securities, and pursuant to this agreement the debtor periodically loaned securities to Maple in return for cash collateral, while at other times Maple loaned securities to the debtor in return for cash collateral.

Maple and the debtor entered into numerous transactions prior to September 27, 2001, the day Stephenson was appointed. Moreover, the debtor involved itself in numerous stock lending and borrowing transactions with companies other than Maple. In each of these lending and borrowing transactions the debtor acted as a lender or a borrower of securities pursuant to a Master Securities Loan Agreement similar to the agreement between the debtor and Maple. For example, the debtor and defendant Advanced Clearing, Inc. were parties to a MSLA dated May 26, 2000, that was substantially similar to the MSLA between the debtor and Maple.

The debtor's securities lending business involved transactions for one of three purposes: (1) loaning stock held by the debtor to raise capital; (2) borrowing stock to make deliveries; or (3) serving as a conduit/intermediary between parties. In this last type of transaction, often referred to as a conduit transaction, the debtor would borrow securities from one party and loan those same securities to another party. In return, the debtor would receive cash collateral from the party to whom it loaned the securities, and the debtor would then post cash collateral with the party from which it borrowed securities as collateral for its own obligations. Maple alleges that the debtor borrowed securities from Advanced Clearing, Inc., and posted with Advanced the cash collateral given to the debtor by Maple, and in return for that cash collateral, Advanced loaned the debtor stocks which the debtor in turn loaned to Maple.

All cash collateral received by the debtor from any party to which the debtor loaned securities was automatically reflected as a debit on the debtor's account at the Depository Trust Company. Similarly, for every transaction in which the debtor borrowed securities, the debtor's DTC account reflected a credit representing the transfer of cash collateral out of the account. On any given day the debtor's DTC account reflected numerous debits and credits that were the result of the plethora of securities transactions in which the debtor participated. Each of these debits and credits were aggregated at the

---

1. Pursuant to a settlement and the stipulation of the parties, the plaintiff's complaint as against Advanced and the trustee's cross claim against Advanced have been dismissed.

end of the day, providing a net amount for the debtor's DTC account. As a consequence, any cash collateral posted by Maple or any other borrower of the debtor was commingled with other cash collateral received by the debtor from various securities transactions that day. Maple has claimed that $1,414,780.19 [2] in cash collateral funds and/or proceeds from such funds, previously held by Advanced Clearing, Inc. and now held in escrow by the trustee [3], are the property of Maple, not the debtor's estate, and should be returned to Maple.

## MJK'S DEMISE

■ On September 25, 2001, the debtor notified federal regulators that it lacked sufficient net capital under applicable federal and self-regulatory rules to continue operations. On September 27, 2001, at the request of the Securities Investors Protection Corporation,[4] the district court entered a Protective Decree against the debtor under 15 U.S.C. § 78eee(b), appointed James P. Stephenson as trustee pursuant to 15 U.S.C. §§ 78aaa–111, and referred the case to the bankruptcy court.

## MAPLE'S CLAIMS

Maple has asserted four claims against the trustee relating to securities lending transactions entered into with the debtor. These claims include declaratory judgment/injunctive relief, specific performance/novation, unjust enrichment, and

constructive trust. The trustee moves for summary judgment on all of Maple's claims.

## SUMMARY JUDGMENT

Summary judgment as set forth in Rule 56(c) [5] is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of material fact is genuine if it has a real basis in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "A genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court is required to view all evidence in the light most favorable to the non-moving party and to give that party the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in the pleadings. *Trnka v. Elanco Prod. Co.,* 709 F.2d 1223, 1225 (8th Cir.1983).

### *Burden of the Moving Party*

Procedurally, the movant has the initial responsibility of informing the court of the

2. Maple, in its Response, only asserts an argument with regard to $1,285,000 of the money at issue in this matter. The trustee argues that Maple has made no effort to identify or trace any amounts beyond $1,285,000, and by not asserting any facts or making any arguments that it can trace an amount exceeding $1,285,000, any potential recovery by Maple is limited to that amount.

3. Pursuant to a settlement, Advanced paid $7,014,179.33 to the trustee. The trustee, in

turn, deposited $1,727,053 in escrow pending the outcome of this proceeding.

4. Although created by Congress, SIPC is neither a government agency nor a regulatory authority. It is a non-profit membership corporation funded by its member securities broker-dealers.

5. Applicable here by operation of Fed. R.Bank.P. 7056.

basis for its motion and identifying those parts of the record which show a lack of genuine issue. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party must show the court that there is an absence of evidence to substantiate the non-moving party's case. *Id.* at 325, 106 S.Ct. 2548. The movant discharges its burden by asserting that the record does not contain a triable issue and identifying that part of the record which supports the moving party's assertion. *City of Mt. Pleasant, Iowa v. Associated Electric Cooperative*, 838 F.2d 268, 273 (8th Cir.1988).

### Burden of the Non–Moving Party

When the moving party has carried its burden under Rule 56(c), the burden of production shifts to the non-moving party, and it must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The non-moving party must go beyond the pleadings and by its own affidavits, depositions, answers to interrogatories, and admissions on file, establish that there are specific and genuine issues of material fact that warrant a trial. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The non-moving party must establish specific significant probative evidence supporting its case. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). If the evidence presented is merely colorable or is not significantly probative, the non-moving party has not carried its burden and the court must grant summary judgment to the moving party. *See* Fed.R.Civ.P. 56(e).

After carefully reviewing the record, I conclude that the trustee has met his burden and that Maple failed to present a genuine issue of any material fact. There is no dispute regarding any of the material facts in this case. The only disputes that exists are about the law and whether Maple's claims can somehow rise in priority over the many general unsecured claims of the debtor's creditors. I conclude that the trustee is entitled to judgment as a matter of law on all four of Maple's claims.

### DISCUSSION

#### Declaratory Judgment/Injunctive Relief

I turn first to count two of Maple's complaint which is pretty much dispositive. Count two requests a declaratory judgment that the cash posted with the debtor as collateral for the stock loan transactions between Maple and the debtor is the property of Maple, and that the amounts owed by Advanced to the debtor under securities loan transactions between those parties is also the property of Maple. Maple further requests injunctive relief in the form of an order prohibiting the trustee from commingling the cash in dispute and delivering the cash or any proceeds to a party other than Maple. In short, it claims the cash held by the trustee is its property and should be returned to it. Maple's second count fails because it cannot identify any funds in the debtor's estate that currently belong to Maple. In coming to this conclusion, I look to the nature of the transfers of cash collateral from the debtor's DTC account, the rights and remedies of the parties as established in their Master Securities Loan Agreement, as well as the statutory laws stated in the Bankruptcy Code and Minn.Stat. § 336.9–101, *et seq.*

■ Maple contends that a disputed fact issue exists as to whether the cash transferred by Maple to the debtor can be traced and identified. It is true that the books and records of the debtor identify the particular amounts of cash collateral posted by Maple to the debtor. The trustee does not dispute that Maple posted cash collateral with MJK in exchange for loaned

securities, and the debtor's DTC reports reflect such transactions. Maple cannot, however, trace and identify the particular assets in the possession of the debtor that Maple claims is its own because once the debtor exercised its rights of alienability under the MSLA, § 3.2 [6], the specific cash collateral Maple once held no longer belonged to Maple. *See California Serv., Inc. v. Cochrane,* 104 Colo. 38, 88 P.2d 569, 572 (Colo.1939) (transferor of cash to account of transferee does not retain title to the cash). Consequently, Maple cannot claim an interest in any specifically identifiable cash, and Maple is left with a claim against the debtor for damages, exactly as provided in § 13 of the MSLA.[7]

Maple contends that the MSLA granted a security interest in favor of MJK as the lender. As such, analysis of the transactions involving the MSLA would take place under Article 9 of the Uniform Commercial Code, as adopted by the state of Minnesota. Maple argues that under the Uniform Commercial Code, MJK as the secured party had a duty of reasonable care with regard to the cash collateral tendered to MJK by Maple, and an obligation to identify that cash collateral.

Under the Uniform Commercial Code a secured party in possession of collateral is required to use reasonable care in the custody and preservation of that collateral. Minn.Stat § 336.9–207(a) (2001). Official Comment 2 to Article 9 § 9–207 of the Uniform Commercial Code further states that "under Section 1–102, the duty to exercise reasonable care may not be disclaimed by agreement, although under that section the parties remain free to determine by agreement standards that are not manifestly unreasonable as to what constitutes reasonable care." U.C.C. § 9–207, Comment 2 (2001). Under the MSLA Maple and MJK did determine what constituted reasonable care with regard to preservation and custody of the cash collateral. As the MSLA states, "(unless Lender is a Broker–Dealer) Lender shall, during the term of any Loan hereunder, segregate Collateral from all securities or other assets in its possession. Lender may pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer the Collateral, or re-register Collateral." *Maple MSLA* § 3.2. Because MJK was a broker-dealer, § 3.2 of the MSLA did not require MJK to segregate the collateral. Maple also gave MJK spe-

6. Section 3.2 of the MSLA states "(unless Lender is a Broker–Dealer) Lender shall, during the term of any Loan hereunder, segregate Collateral from all securities or other assets in its possession. Lender may pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer Collateral, or re-register Collateral."

7. Section 13 of the MSLA states that "Upon the occurrence of a default under Section 11 entitling Borrower to terminate all Loans hereunder, Borrower shall have the right ... (a) to purchase a like amount of Collateral (Replacement Collateral) in the principal market for such Collateral in a commercially reasonable manner, (b) to sell a like amount of the Loaned Securities in the principal market for such securities in a commercially reasonable manner and (c) to apply and set off the Loaned Securities and any proceeds thereof against (i) the payment of the purchase price for such Replacement Collateral (ii) Lender's obligation to return any cash or other Collateral and (iii) any amounts due to Borrower under Sections 4, 7, and 17. In such event, Borrower may treat the Loaned Securities as its own and Lender's obligation to return a like amount of the Collateral shall terminate ... In the event that (i) the sales price received from such Loaned Securities is less than (ii) the purchase price of Replacement Collateral (plus the amount of any cash or other Collateral not replaced by Borrower and all other amounts, if any, due to Borrower hereunder), Lender shall be liable to Borrower for the amount of any such deficiency, together with interest on such amounts."

cific rights of alienability with regard to the collateral, and in fact MJK exercised those rights by disposing of the collateral. Furthermore, under Minn.Stat. § 336.9–207(b)(3) (2001), the cash collateral Maple posted with MJK was fungible collateral that could be commingled. MJK, pursuant to statute and the parties' agreement, commingled the cash collateral with the collateral of all those who borrowed securities from MJK. Under the Uniform Commercial Code, MJK as the secured party could use the collateral to the extent agreed to by the debtor. Minn.Stat. § 336.9–207(b)(4)(C) (2001). Maple, pursuant to Minnesota Statute and § 3.2 of the MSLA, gave MJK the right to pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer the collateral. Essentially, Maple gave MJK permission to treat the cash as its own.

■■■ Maple characterizes the transactions between MJK and Advanced as a repledge of Maple's collateral. The Uniform Commercial Code in Minnesota states that a secured party having possession or control of collateral may create a security interest in the collateral. Minn. Stat. § 336.9–207(c)(3) (2001). Official Comment 5 to Article 9 § 9–207(c)(3) states:

> the expectations and business practices in some markets, such as the securities markets, are such that the debtor's consent to secured party number two's taking free of the debtor's rights inheres in the debtor's creation of secured party number one's security interest which gives rise to secured party number one's power under this section. In these situations, the debtor would have no right to recover the collateral or recover damages from secured party number two. Nevertheless, the debtor would have a damage claim against secured party

number one if secured party number one had given a security interest to secured party number two in breach of its agreement with the debtor.

U.C.C. § 9–207, Comment 5 (2001). Thus, Maple as the borrower under the MSLA gave MJK, secured party number one, the right to transfer the collateral, and because of this would not have a right to recover that collateral or damages from Advanced as secured party number two. Furthermore, the recovery against MJK would be in the form of damages. Similarly, Official Comment 3 to Article 9 § 9–625 states that the basic remedy for the secured party's failure to comply with Article 9 is a damage recovery in the amount of loss caused by the non-compliance. U.C.C. § 9–625, Comment 3 (2001). The MSLA recognizes this limitation of remedies and states that in the event of a breach on the part of the lender (MJK), the "borrower (Maple) may treat the loaned securities as its own and lender's obligation to return a like amount of the collateral shall terminate ... In the event that the sales price received from such loaned securities is less than the purchase price of replacement collateral, lender shall be liable to borrower in the amount of such deficiency, together with interest on such amounts." *Maple MSLA* § 13. Thus, recovery in the form of damages is contemplated not only by the Uniform Commercial Code but also the parties' own agreement. Maple is entitled to a claim against MJK's estate in an amount equal to the amount of cash delivered to MJK pursuant to the MSLA, less the value of any securities delivered by MJK to Maple, plus interest through September 27, 2001. The trustee acknowledges that Maple has a claim against MJK, but argues that this claim merely falls into the category of a general unsecured claim, and on that point

874

the trustee is correct.[8]

### Applicability of 11 U.S.C. § 544(a)

 Even if Maple had an interest in either the cash in possession of the trustee, or the amounts owed by Advanced to the debtor, the trustee could avoid such interests.[9] The trustee as hypothetical lien creditor can avoid, under 11 U.S.C. § 544(a)(1), any interest of Maple in claims by the debtor against Advanced. Similarly, the trustee can avoid any interest of Maple in the funds transferred by Maple to the debtor pursuant to the MSLA.

 Maple argues that 11 U.S.C. § 544 [10] is inapplicable because MJK's estate does not possess an equitable interest in the cash collateral owed by Advanced to MJK.[11] Estate property is broadly defined and encompasses conditional, future, speculative and equitable interests of the debtor. *U.S. ex rel Gebert v. Transport Admin. Serv.*, 260 F.3d 909, 913 (8th Cir. 2001). The right of complete alienability, given to the debtor by Maple, is sufficient to make the collateral property of the estate. In addition, the property of the estate also includes all causes of action the debtor could have brought at the time of the bankruptcy petition. *Id.* Causes of action belonging to the debtor at the commencement of the bankruptcy case are included within the definition of property of the estate, and any of these actions that are unresolved at the time of filing pass to

8. A claim for amounts lost pursuant to a failed securities loan transaction is classified as a general unsecured claim. *In re John Muir & Co.*, 51 B.R. 150, 154 (Bankr.S.D.N.Y. 1985).

9. The fundamental purpose of Article 9 is to create certainty by allowing creditors to rely on specific perfection and priority rules that govern collateral within the scope of Article 9. *The Boatmen's National Bank of St. Louis v. Sears, Roebuck and Co.*, 106 F.3d 227, 230–231 (8th Cir.1997). Under the MSLA, Maple was not a creditor of MJK but was a borrower. Thus, perfection of any interest Maple would have had would not be contemplated under the U.C.C.

10. Section 544(a) is applicable to this proceeding pursuant to 15 U.S.C. § 78fff(b). The trustee has the powers of a trustee under Section 544(a) of the Bankruptcy Code, and has the status of a hypothetical lien creditor or judgment creditor of the debtor.

11. Maple cites the cases of *In re N.S. Garrott & Sons*, 772 F.2d 462 (8th Cir.1985), and *In re Loe*, 83 B.R. 641 (Bankr.D.Minn.1988) to support its contention that the cash collateral owed to the debtor from Advanced is not property of the estate because the "bankrupt's estate succeeds only to the property rights held by the pledgee prior to the commencement of the case." (Response at 19). Nei-

ther of these cases, however, supports Maple's argument. In *N.S. Garrott & Sons*, the court held that escrowed funds were the property of the estate, but the court imposed a constructive trust on the escrowed funds, limiting the debtor's interest to the extent permitted by the escrow agreement. *In re N.S. Garrott & Sons*, 772 F.2d at 466–467. Also in that case the debtors fraudulently acquired a mortgage loan by falsifying title documents for the real property that secured the loan. *Id.* at 464. The debtors then moved the proceeds of the fraudulently obtained loan into an escrow account which contained specific provisions for the use of the escrowed funds. *Id.* at 464–465. The court held the debtors' fraudulent scheme gave rise to a constructive trust under Arkansas law, and that the bankruptcy estate could not have any greater rights in the escrowed funds than those rights held by the debtors in such funds prior to bankruptcy, that is the estate's rights to the escrowed funds were to the extent permitted under the escrow agreement. *Id.* at 467. In *Loe* the bankruptcy court found that the property in question, the debtor's interest in a pension plan, was part of the estate, but the bankruptcy trustee held this interest subject to the same provisions of such pension plan which restricted the debtor's interest. *In re Loe*, 83 B.R. at 646. Neither of these cases supports the contention that the debtor, and later the trustee, would not have an interest in the property transferred to and used by it under the terms of the MSLA.

the trustee, who as estate representative has the responsibility of asserting them whenever necessary for preservation of the estate. *In re Ozark Restaurant Equipment Co., Inc.*, 816 F.2d 1222, 1225 (8th Cir.1987); *see, e.g., Sosne v. Reinert & Duree, (In re Just Brakes Corporate Systems, Inc.)*, 108 F.3d 881, 884 n. 2 (8th Cir.1997) (stating that the property of the bankruptcy estate is broadly defined in § 541(a)(1) of the Bankruptcy Code); *In re Powell*, 187 B.R. 642, 644 (Bankr.D.Minn. 1995) (stating that the commencement of a case under the Bankruptcy Code creates an estate which is comprised of virtually all the legal and equitable interests of the debtor in property wherever located, and that any exception or exclusion from the estate must be narrowly construed); *Patterson v. Shumate*, 504 U.S. 753, 757, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) (stating that the scope of the estate is broad and all encompassing).

■■■ Thus, the amounts in the debtor's bank account at the commencement of its liquidation proceeding is property of the estate under 11 U.S.C. § 541(a)(1). Any amounts owing from Advanced to the debtor would be considered rights to payment under contract, and accordingly are also property of the estate. *Id.* Moreover the trustee, as representative of the estate, would have a right to obtain the amounts owing to the debtor for the preservation of the estate. *In re Ozark Restaurant Equipment Co., Inc.*, 816 F.2d at 1225.

■■■ The extent of the trustee's rights as a judicial lienholder or judgment creditor is measured by the state law governing the property in question.[12] 5 *Collier on Bankruptcy* ¶ 544.02, at 544–5 (Alan N. Resnick & Henry J. Sommer,

eds., 15th rev. ed.2002); *see also In re Greenhaven Village Apartments of Burnsville Phase II Limited Partnership*, 100 B.R. 465, 468 (Bankr.D.Minn.1989). In Nebraska, Advanced's principal place of business, the holder of a judicial lien against the debtor or a judgment creditor of the debtor would have the right to garnish Advanced and convert ownership of the amounts owed by Advanced to the debtor to satisfy a lien or judgment. Neb. Rev.Stat. §§ 25–1001 – 25–1056 (2001). Such a garnishment would attach to all amounts owed by Advanced to the debtor MJK, priming any interest of Maple in such amounts or claims for repayment. Neb.Rev.Stat. § 25–1056 (2001).

■■■ Maple correctly points out that under Nebraska law, an entity claiming an ownership interest in money or property may intervene in a garnishment action and assert such property interest. *See* Neb. Stat. § 25–1030.03 (2001). The statute states that if the debt or property is found to be the property of the intervening party, the garnishee is discharged from the garnishment concerning such property. *Id.* For reasons stated throughout this opinion, the property owed to the debtor from Advanced and later turned over to the trustee is not the property of Maple. So while Maple would have the right to intervene in such a proceeding in Nebraska, the hypothetical judgment lien creditor (and therefore the trustee) would prevail.

■■■ Regarding the funds in the possession or control of the trustee, even if Maple could demonstrate that it had an interest in these funds, the trustee can also avoid such interest under 11 U.S.C. § 544(a). In Minnesota, the debtor's principal place of business, the holder of a

---

**12.** Presumably a judgment creditor would have to attach the property in Nebraska, so Nebraska law applies.

judicial lien against the debtor or a judgment creditor of the debtor would have the right to garnish any funds on deposit in any of the debtor's deposit accounts to satisfy such lien or judgment. Minn.Stat. § 571.71–571.932 (2001). Such garnishment would attach to all funds in the debtor's deposit accounts, and prime any interest that Maple would have had in such funds. Minn.Stat. § 571.81 (2001).

### Novation/Specific Performance

■ Count one of Maple's complaint asserts a claim against the trustee for novation/specific performance.[13] Specifically, Maple requests that I grant specific performance by ordering the debtor, MJK, to participate in a novation with Maple and Advanced Clearing to close out conduit transactions between those parties. Maple's request confuses the purpose of specific performance.

■ Specific performance is an equitable remedy which compels performance of a contract. 3 Dan B. Dobbs, *Law of Remedies* 189–190 (2d ed.1993). A request to compel the specific performance of a contract is an application of the sound discretion of the court. *Pope Mfg. Co. v. Gormully*, 144 U.S. 224, 237, 12 S.Ct. 632, 36 L.Ed. 414 (1892); *Fred O. Watson Co. v. United States Life Ins. Co. in City of New York*, 258 N.W.2d 776, 778 (Minn. 1977). In general, specific performance of a contract relating to personal property will not be granted because the violation of such a contract may be estimated in damages. *Moulton v. Warren Mfg. Co.* 81

Minn. 259, 83 N.W. 1082, 1082–1083 (1900) (stating that specific performance of a contract for the transfer of personal property, as a general rule, will not be ordered except when an action at law cannot provide an adequate remedy, (such as when the value of the property cannot be readily ascertained), or the chattel has a value peculiar to the person seeking relief); *Alsdorf v. Svoboda*, 239 Minn. 1, 57 N.W.2d 824, 829 (1953) (stating that ordinarily, specific performance of a contract relating to personal property will not be granted). Specific performance will not be decreed when, for any reason, it would be inequitable. *Buckley v. Patterson*, 39 Minn. 250, 39 N.W. 490 (1888). A party does not have an automatic right to specific performance as a remedy for breach of a contract, the court must balance the equities of the case and determine whether the equitable remedy of specific performance is appropriate. *Pope Mfg. Co.*, 144 U.S. at 237, 12 S.Ct. 632; *Dakota County HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn. 1999) (citing *Boulevard Plaza Corp. v. Campbell*, 254 Minn. 123, 94 N.W.2d 273, 284 (1959)). An agreement will be enforced "where the specified thing or act contracted for, and not mere pecuniary compensation, is the redress practically required." *Butler Bros. Co. v. Levin*, 166 Minn. 158, 207 N.W. 315, 317 (1926) (quoting *Irvine v. Armstrong*, 31 Minn. 216, 17 N.W. 343 (1883)).

■ Maple's request for specific performance[14] ordering MJK to participate in

---

**13.** Minnesota law applies to Maple's claim for specific performance. Matters of procedure and remedy are governed by the law of the forum. *Davis v. Furlong*, 328 N.W.2d 150, 153 (Minn.1983). The court of the forum, subject to only the limits of the federal constitution, determines whether a given question involves one of substance or of remedy.

*Anderson v. State Farm Mut. Auto. Ins. Co.*, 222 Minn. 428, 24 N.W.2d 836, 839 (1946).

**14.** Maple's complaint, (Complaint ¶ 30), as well as the prayer for relief, (Complaint at 8), requests specific performance in the form of a novation agreement. In Maple's response, however, Maple stated that it sought specific performance in the form of MJK and the

a novation agreement [15] misapplies the remedy of specific performance, which is to require the parties to perform the terms of the contract. Nowhere in the MSLA is a novation agreement involving MJK, Maple and Advanced addressed. It is therefore difficult to see how a novation could be considered specific performance.

▆▆▆▆▆ Even if I were to broadly construe the request by Maple as a request to order the trustee to pay its claim in full, granting specific performance when there is a valid contract and an adequate remedy at law is inappropriate. *U.S. Fire Ins. Co. v. Minnesota State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn.1981) (stating that equitable relief, (the equitable relief sought was unjust enrichment), cannot be granted where the rights of the parties are governed by a valid contract); *Northern Trust Co. v. Markell*, 61 Minn. 271, 63 N.W. 735 (1895) (stating as a general rule specific performance relating to personal property will be denied because the law affords adequate redress in an action for damages). The MSLA is a valid contract governing the relationship between the parties as well as the remedies of both. *See Maple MSLA* §§ 12, 13. Maple's claim for damages under the MSLA provides it with an adequate remedy at law, and such a remedy is exactly what the parties bargained for. Moreover, this is not the type of situation where the property involved is so unique that the measure of damages is difficult to calculate, thus warranting specific performance. *See Nason v. Barrett*, 140 Minn. 366, 168 N.W. 581, 582 (1918) (finding that one of the reasons specific performance for the sale of stock was warranted in the case was because its value

was not easily ascertainable). Finally, what Maple is essentially requesting is mere pecuniary compensation. A court of equity, however, will not specifically enforce an action to pay money. *Butler Bros. Co.* 207 N.W. at 317; *see also Raton Waterworks Co. v. Town of Raton*, 174 U.S. 360, 364, 19 S.Ct. 719, 43 L.Ed. 1005 (1899) (stating that an action at law is the proper remedy to enforce payments of money).

▆▆▆▆▆ Maple argues that because the debtor is insolvent, Maple may not receive its damages in full, and by virtue of this fact their remedy at law is not adequate.[16] This, of course, is true for every creditor of an insolvent debtor. A party's insolvency may be a circumstance to be considered in determining whether the remedy at law by way of judgment is adequate, yet it is also a circumstance to be considered in connection with whether specific performance would enable the plaintiff to obtain a preference over the debtor's other creditors, thus causing inequity. *Jamison Coal & Coke Co., v. Goltra*, 143 F.2d 889, 894 (8th Cir.1944). Furthermore, one of the cardinal rules of a court in the exercise of its discretion in granting or denying specific performance is that it must appear that specific performance will not result in injustice. *Willard v. Tayloe*, 8 Wall. 557, 75 U.S. 557, 567, 19 L.Ed. 501 (1869) (stating that in general it may be said that specific relief will be withheld when it is apparent, from a view of all the circumstances of the particular case, that it will produce hardship or injustice). By awarding Maple specific performance, Maple, who is currently an unsecured creditor, would obtain

---

trustee returning its cash collateral (Response at 23).

**15.** A novation is an agreement whereby one party removes itself from the middle of a conduit transaction.

**16.** Maple cites *Connecticut National Bank v. Trans World Airlines, Inc.*, 762 F.Supp. 76, 80–81 (S.D.N.Y.1991) to support this argument.

a preference over other unsecured creditors of the debtor's estate. Such a result would be inequitable and would result in injustice.

## Unjust Enrichment

 Count three of Maple's complaint asserts a claim for unjust enrichment.[17] Specifically, the complaint states "to the extent that the trustee obtains the Collateral from Advanced Clearing and declines to return it to Maple, the debtor shall have been unjustly enriched. As a result of that inequity, Maple shall have been damaged to the full extent of the debtor's unjust enrichment—that is the full value of the collateral less the value of the Loaned Securities."

 Unjust enrichment has been invoked in support of claims based upon the failure of consideration, fraud, mistake, and in other situations where it would be morally wrong for one party to enrich himself at the expense of another. *Cady v. Bush,* 283 Minn. 105, 166 N.W.2d 358,

361–362 (1969). Unjust enrichment claims do not lie simply because one party benefits from the efforts of others, instead "it must be shown that a party was unjustly enriched in the sense that the term unjustly could mean illegally or unlawfully." *Schumacher v. Schumacher,* 627 N.W.2d 725, 729 (Minn.Ct.App.2001) (quoting *First Nat'l Bank of St. Paul v. Ramier,* 311 N.W.2d 502, 504 (Minn.1981)). Unjust enrichment is an equitable claim that arises when a party gains a benefit illegally or unlawfully, and there is no valid contract completely governing the rights of the parties. *Stein v. O'Brien,* 565 N.W.2d 472, 474 (Minn.Ct.App.1997). It must be kept in mind that the principle of unjust enrichment should not be invoked merely because a party has made a bad bargain. *Cady v. Bush,* 166 N.W.2d at 362. Courts are not warranted in interfering with the contractual rights of parties as evidenced by their writings which purport to express their full agreement. *Id.*

 Maple's claim for unjust enrichment fails because there is a valid contract

17. To the extent a choice of law question exists concerning the law to be applied to Maple's unjust enrichment claim, Minnesota courts first look at whether there is an actual conflict between the law of the two states. *Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co.,* 604 N.W.2d 91, 93 (Minn.2000); *Jepson v. General Cas. Co.,* 513 N.W.2d 467, 469 (Minn.1994). A conflict exists if the choice of one forum's law over the other will determine the outcome of the case. *Id. See also Myers v. Government Employees Ins. Co.,* 302 Minn. 359, 225 N.W.2d 238, 241 (1974) (stating that before the court applies any legal standard, it must first be determined if an actual conflict exists, i.e., will the choice of one law as compared to another determine the outcome). In this case, there is no actual conflict between the law of New Jersey (Maple's principal state of business), and the law of Minnesota regarding unjust enrichment claims. *Compare Shalita v. Township of Washington,* 270 N.J.Super. 84, 636 A.2d 568, 571 (Super.A.D.1994) ("generally the parties are bound by their agreement, and there is no ground for impos-

ing an additional obligation where there is a valid unrescinded contract that governs their rights"); *Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 608 A.2d 280, 285 (1992) ("[c]ourts generally allow recovery in quasi-contract when one party has conferred a benefit to another, and the circumstances are such that to deny recovery would be unjust"); *Suburban Transfer Service, Inc., v. Beech Holdings, Inc.,* 716 F.2d 220, 226 (3rd Cir.1983) (affirming the U.S. District Court for the District of New Jersey and holding that plaintiff's claim for unjust enrichment fails as a matter of law because the parties are bound by their agreement and there is no ground for implying a promise as long as a valid unrescinded contract governs the rights of the parties), *with Stein v. O'Brien,* 565 N.W.2d 472, 474 (Minn. Ct.App.1997) ("unjust enrichment is an equitable claim that arises when a party gains a benefit illegally or unlawfully, and there is no valid contract completely governing the rights of the parties"). Accordingly, the law of the forum should be applied.

completely governing the rights of the parties. *Stein*, 565 N.W.2d at 474. I will not interfere with the contractual rights and remedies that were bargained for by Maple and MJK. *See Cady*, 166 N.W.2d at 362. The MSLA clearly identifies the rights and remedies of both parties. *See Maple MSLA* §§ 12, 13.

▮ Maple's claim for unjust enrichment also fails because there was no mistake or actionable fraud, and Maple cannot prove that the debtor or the trustee committed any illegal or unlawful acts. Maple alleges that the trustee converted its property, giving rise to unjust enrichment.[18] Conversion exists when a defendant has wrongfully exercised dominion over a plaintiff's personalty that is without justification or that is inconsistent with the rights of the person entitled to use, possession, or ownership of the property. *Fawcett v. Heimbach*, 591 N.W.2d 516, 519–520 (Minn.Ct.App.1999). A disposition of property consented to by the owner is not a conversion of that property. *Griffin v. Bristle*, 39 Minn. 456, 40 N.W. 523 (1888); *see also Nieter v. McCaull–Dinsmore Co.*, 159 Minn. 395, 199 N.W. 85, 86 (1924) (stating that if appellant's assignors consented to the shipment of their grain to a terminal market, there was no unauthorized dominion over their property before it was sold in the market, and hence an action for conversion would not lie); *Carlson v. Schoch*, 141 Minn. 236, 170 N.W. 195, 196 (1918) (stating that a correct statement of the law is conversion does not lie when the property was taken under an agreement with the plaintiff and therefore with his knowledge and consent).

▮ In this case, a conversion of Maple's property did not occur. Maple expressly granted MJK permission to pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer the collateral, and MJK exercised this right. A conversion cannot occur when the owner gives consent to the disposition of that property. *Griffin*, 40 N.W. at 523–524.

It is hard to see how the trustee has been unjustly enriched, but to the extent it could be argued that either the debtor or the trustee was enriched, it was not unjust.

### Constructive Trust

Count four of Maple's complaint asserts a claim for a constructive trust. Maple's complaint specifically alleges that the cash held by Advanced as collateral for the debtor's stock loan transactions with Advanced is actually the property of Maple. By virtue of this fact, Maple contends that such cash should be held in a constructive trust for Maple's benefit. The request is somewhat internally inconsistent. If the property was actually Maple's property, creation of a constructive trust would be unnecessary. To the extent the trustee is not holding Maple's property, imposition of a constructive trust is inappropriate.

▮ "The imposition of a constructive trust is an equitable remedy which the court has discretion to grant or deny." *In re Dynamic Technologies Corp.*, 106 B.R. 994, 1007 (Bankr.D.Minn.1989) (citing *Thompson v. Nesheim*, 280 Minn. 407, 159 N.W.2d 910, 916 (1968)). The imposition

---

**18.** Maple does not allege an illegal or unlawful act on the part of the debtor or the trustee in its complaint, yet states in its response, "When a secured creditor cannot or will not return to the debtor collateral that it is holding as security upon satisfaction of the debtor's obligations, the secured party is guilty of conversion ... This is precisely what the trustee is attempting to do in this situation. Maple is entitled to the return of its property, but the trustee would rather convert Maple's property and saddle Maple with a general unsecured claim." (Response at 24).

of a constructive trust in bankruptcy may be appropriate if it would be sufficient under applicable state law. *Kunkel v. Ries (In re Morken),* 199 B.R. 940, 964 (Bankr.D.Minn.1996); *see also N.S. Garrott & Sons v. Union Planters Nat'l Bank,* 772 F.2d 462, 466 (8th Cir.1985) (stating that imposition of a constructive trust is appropriate only where it would be applicable under state law). However, it is the federal bankruptcy law that ultimately determines whether a constructive trust is appropriate in a bankruptcy case. *Kunkel v. Ries (In re Morken),* 199 B.R. at 964. The unique considerations involved in a bankruptcy case must drive the result on the constructive trust issue. *Id.* There is no unyielding formula for a court to apply in decreeing a constructive trust. *Knox v. Knox,* 222 Minn. 477, 25 N.W.2d 225, 228 (1946). Under Minnesota law, a court may impose a constructive trust only when there is clear and convincing evidence that a constructive trust is necessary to prevent unjust enrichment. *In re Estate of Eriksen,* 337 N.W.2d 671, 674 (Minn.1983) (citing *Knox v. Knox,* 222 Minn. 477, 25 N.W.2d 225, 228 (1946)). However, we have already seen that there has been no unjust enrichment. A constructive trust will arise "whenever the legal title to property is obtained through fraud, oppression, duress, undue influence, force, crime, or similar means, or by taking improper advantage of confidential or fiduciary relationship." *Bly v. Gensmer,* 386 N.W.2d 767, 769 (Minn.App.1986) (quoting *Wright v. Wright,* 311 N.W.2d 484, 485 (Minn. 1981)). None has been shown. A constructive trust may be imposed only where there is some specific property identified as belonging, in equity and conscience, to the plaintiff. *Rock v. Hennepin Broadcasting Associates, Inc.,* 359 N.W.2d 735, 739 (Minn.App.1984). Such property has not been identified. Imposition of a constructive trust requires that the subject of the trust can be traced and identified with a sufficient degree of specificity. *In re Dartco, Inc.,* 197 B.R. 860, 868–869 (Bankr. D.Minn.1996). It cannot be.

There is no clear and convincing evidence that a constructive trust is necessary to prevent unjust enrichment in this case. Maple's claim for unjust enrichment fails as a matter of law because Maple cannot prove that an illegal or criminal act has occurred on the part of the debtor or the trustee.[19] Moreover, Maple's claim for unjust enrichment fails because there is a valid contract governing the rights and remedies of the parties.

Second, the cash collateral in dispute was not obtained through fraud, oppression, duress, undue influence, force, crime, or by taking improper advantage of a confidential or fiduciary relationship. The MSLA specifically granted the debtor the right to pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer or re-register the collateral. Consequently, the debtor was well within its rights to transfer the cash collateral. Also the debtor, pursuant to terms of the MSLA, was not required to segregate the collateral. Furthermore, Maple has failed to establish a cause of action for conversion and has not proven that the debtor or the trustee acted in any criminal or illegal manner.

Third, Maple has not been able to trace and identify with specificity the cash collateral that it posted with the debtor. Because the collateral was commingled with numerous other cash collateral funds transferred daily to the debtor's DTC account and then aggregated into a net settlement figure, tracing and identifying the collateral specifically belonging to Maple is impossible. Furthermore, Maple has not proven that it has traced or identified with

**19.** *See* footnote 18.

specificity the cash collateral it posted with the debtor to Advanced or any account of the trustee.

Finally, Maple's claim for a constructive trust fails because imposition of a post-petition constructive trust is inappropriate when its effect is to give the plaintiff a preference over other creditors.[20] *Kunkel v. Ries (In re Morken)*, 199 B.R. at 964–965. Maple asserts the remedy of a constructive trust as a general unsecured creditor. Constructive trusts cannot be used to alter the priority scheme explicitly prescribed by Congress. *Id.* at 966. If a creditor claims a constructive trust on property of the estate, there is a conflict with the Code's priority rules because one creditor would be preferred over the other creditors in contravention of the Bankruptcy Code's detailed distribution scheme. *Id.* Maple is not entitled to a constructive trust because doing so would allow Maple to rise in priority over other general unse-cured creditors and such a result is not in agreement with the Bankruptcy Code. Unless a court has already impressed a constructive trust upon certain assets the claimant cannot properly represent to the Bankruptcy Court that he was, at the time of commencement of the case, a beneficiary of a constructive trust held by the debtor. *Id.* No constructive trust was imposed on the behalf of Maple at the commencement of the debtor's bankruptcy case. Moreover, the circumstances of this case do not rise to a level so egregious as to warrant the disruption of priority schemes. Not only would it be inequitable to allow Maple to advance itself ahead of the general creditor body, there are other broker-dealers with claims that exceed the amount the trustee has on hand.[21]

## CONCLUSION

Since Maple lost all its rights in the cash collateral when the debtor spent it, its sole

**20.** Courts are split as to whether constructive trusts can be imposed in bankruptcy cases. *In re Morken*, 199 B.R. 940, 964 (Bankr. D.Minn.1996); *Shubert v. Jeter (In re Jeter)*, 171 B.R. 1015, 1020 (Bankr.W.D.Mo.1994), *aff'd*, 73 F.3d 205 (8th Cir.1996). The Eighth Circuit has not placed a total ban on constructive trusts, but allows them in very limited circumstances. *Kunkel v. Ries (In re Morken)*, 199 B.R. at 964. The circumstances under which the Eighth Circuit has allowed imposition of a post-petition constructive trust involved creditors who asserted ownership interests in exempt property, not property of the estate. *Id.* In *Chiu v. Wong*, the debtors misappropriated funds and invested the money in exempt homestead property in order to shield the funds from creditors. *Chiu v. Wong*, 16 F.3d 306 (8th Cir.1994). There the Eighth Circuit imposed a post-petition constructive trust on the exempt homestead property because the trust was imposed on the debtor's property, and did not diminish the estate to the detriment of other creditors. The Eighth Circuit may also allow imposition of a post-petition constructive trust to prevent a fraudulent debtor from being unjustly enriched. *See Shubert v. Jeter (In re Jeter)*, 171 B.R. at 1020. In *Jeter* the bankruptcy court found that the creditor's claim for a constructive trust was a disguised attempt to recover pre-petition fraudulent transfers. The Eighth Circuit affirmed the bankruptcy and district courts, holding that because the debtor was not unjustly enriched by his fraud, the creditor was not entitled to any special rights. The court compared the circumstances in *Jeter* to those in *Chiu v. Wong* and reasoned that unlike the remaining creditors in Chiu v. Wong, the other creditors in *Jeter* would have been prejudiced by the imposition of a trust favoring one particular creditor. *Shubert v. Jeter*, 73 F.3d at 207 n. 2. Thus in the Eighth Circuit there are at least two requirements before a constructive trust can be imposed: the debtor's misconduct allows principles of equity to override legal considerations, and the contest is between a creditor and the debtor, not among creditors. *Kunkel v. Ries (In re Morken)*, 199 B.R. at 956.

**21.** While the record does not have specific figures, at oral argument the trustee indicated that there may be claims as high as $100,000,000, while he has on hand approximately $10,000,000.

rights are as a holder of an unsecured claim, subject to its rights to liquidate the stock. I note in passing that this result is consistent with the actual appearance of the nature of this transaction. For all intents and purposes it looks like the debtor borrowed money from Maple and pledged stock to Maple to secure its repayment of the loan. If that were the nature of the transaction, Maple's remedies would be to liquidate its collateral (the stock) and pursue a claim for the balance. That is exactly the position Maple finds itself in.

### ORDER

THEREFORE, IT IS ORDERED that:

1. The trustee's motion for summary judgment is granted.

2. The plaintiff shall recover nothing from defendant James P. Stephenson on its complaint.

LET JUDGMENT BE ENTERED ACCORDINGLY.

**In re Tammra K. HOLMAN, Debtor.**

No. 02–60633.

United States Bankruptcy Court,
D. Minnesota.

Dec. 19, 2002.

David G. Velde, Alexandria, MN, trustee.

Thomas L. D'Albani, Bemidji, MN, for defendant.

## ORDER SUSTAINING OBJECTION TO EXEMPTION

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter came before the Court on the Chapter 7 Trustee's objection to the Debtor's claimed homestead exemption in real property. David G. Velde, the Trustee, appeared *pro se*. Thomas L. D'Albani appeared on behalf of the Debtor, Tammra K. Holman. Upon the conclusion of arguments made at the hearing, the Court took the matter under advisement.

Based upon all the files, proceedings and records herein, and being fully advised in the premises, the Court now makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### I. Introduction

The facts in this case are undisputed. The Debtor, Tammra K. Holman, was formerly married to Keith A. Holman. During their marriage the Holmans owned and resided at real property legally described as Lots 10 and 11, Block 1, Wolf Lake Scenic Point Addition, Beltrami County, Minnesota. They owned the property together as joint tenants, and the deed still reflects the same ownership today.

Sometime in approximately November 2000, the Debtor vacated the marital property. Her husband remained and continues to reside in the property. The Debtor moved out of the property as part of the process of dissolving the marriage, and she has not occupied the marital homestead since she left two years ago. The Debtor rents a separate dwelling in the same area. The Holmans share physical custody of their minor daughter, with the daughter spending half of her time with her father in the homestead property, and half of her time with the Debtor in the rented dwelling.

The Debtor continues to be obligated on the mortgage on the homestead property. In 2001 the Holmans, still married, filed a joint income tax return deducting the mortgage interest paid against the property. At no time since vacating the property, however, did the Debtor record in Beltrami County pursuant to Minn.Stat. 510.07 an intent not to abandon the homestead property.

On February 28, 2002, the Holmans' marriage was dissolved by a Judgment and Decree entered by the Minnesota state district court for Beltrami County. With regard to the marital homestead property, the dissolution decree provided: "The parties shall retain joint ownership in the

subject property until such time as respondent pays the petitioner [the Debtor] her share of the equity in the subject property which totals $34,149." The dissolution decree further provided that Keith Holman was to make the payment within 60 days of the date of the decree and that failing his ability to do so, the "property shall be sold, the underlying mortgage debts paid, and the balance of funds split equally between petitioner and respondent."

The dissolution Judgment and Decree was amended on July 1, 2002, in pertinent part to reflect a change in the amount of the Debtor's share of the equity in the property, a decrease to $21,315.15. The amended decree did not change the payment–within–60–days or sale-and-division-of-proceeds provisions.

On June 27, 2002, the Debtor filed her Chapter 7 bankruptcy petition. On her Schedule C, the Debtor selected exemptions pursuant to 11 U.S.C. § 522(b)(1) and § 522(d), and claimed the property exempt under § 522(d)(1). She listed the value of the claimed exemption at $34,149 and the current market value of the property at the same amount. The schedule does not appear to have been amended since the dissolution decree was amended.

Accordingly, the Debtor had not occupied the homestead property for 19 months before filing for bankruptcy relief. At the time of the dissolution of the Holmans' marriage, the Debtor had not occupied the property for approximately 15 months. At the time of filing, the Debtor had been divorced for 4 months.

## II. Discussion

*Defining the Debtor's Interest in the Property*

■ As a preliminary matter, it is necessary to determine the nature of the Debtor's interest in the property at the various potentially relevant times. While the Debtor was married, the property was held by the Holmans in joint tenancy. Under Minnesota law, joint tenants each share an undivided interest, a right of survivorship, and a present right to use and occupy the real estate. *See O'Hagan v. United States,* 86 F.3d 776, 779 (8th Cir.1996), citing *Hendrickson v. Minneapolis Fed. Sav. & Loan Ass'n,* 281 Minn. 462, 161 N.W.2d 688 (1968).

The final effect of the dissolution decree as to the Debtor is clear. It provides that the Holmans will continue to hold joint ownership of the property *until* the Debtor receives her portion of the equity in an amount certain by payment or by sale. As to Keith Holman, the decree awards him the right to either pay the Debtor and exclusively retain the property or sell the property and share the proceeds therefrom with the Debtor. In either event the decree contemplates for the Debtor only a payment as a result of her interest in the subject property. The decree does not, however, indicate specific requirements or any particular instrument or mechanism for executing the disposition of the Debtor's interest in the event of a payment and not a sale.

If the property would have been sold prior to the filing of this bankruptcy case, the Debtor would no longer have an ownership interest in the property. She would have an interest in her portion of the proceeds. But the property has not been sold. If the Debtor's husband had made the lump sum equity payment to the Debtor in lieu of the homestead being sold, then presumably the state court would necessarily have enforced its decree by ordering some manner of implementing the language awarding the entire homestead property to the Debtor's former husband. Therefore, had the single payment been made, the Debtor would likewise have an interest in proceeds and not an ownership interest. But the equity payment of $21,315.15 has not been made. At the

time of filing and at the time of the hearing on this matter, the Debtor's interest, though divided and valued by the dissolution decree, is not in proceeds.[1]

The decree fails to provide the means required to consummate the award of the property exclusively to Keith Holman, such as for example a quitclaim deed executed by the Debtor. This is not a case in which the Debtor retains a marital or other lien on the property. Although it looks like the Debtor's interest is in a right to a payment, the decree did not dispose of her ownership interest. At the time of filing bankruptcy, the Debtor maintained her joint tenancy ownership interest in the property.

■ By filing bankruptcy, however, the joint tenancy in which the Debtor and her former husband held the property was severed. As of June 27, 2002, the Debtor and her former husband own the property as tenants in common. "A severance of a joint tenancy interest in real estate by a joint tenant shall be legally effective only if (1) the instrument of severance is recorded in the office of the county recorder or the registrar of titles in the county where the real estate is situated; or (2) the instrument of severance is executed by all of the joint tenants; or (3) the severance is ordered by a court of competent jurisdiction; or (4) a severance is effected pursuant to bankruptcy of a joint tenant." See M.S.A. § 500.19(5); see also *Wendt v. Hane,* 401 N.W.2d 457, 459 (Minn.Ct.App.1987) (MSA § 500.19 restricts severance of joint tenancies in derogation of common law and must be strictly construed).

*Homestead Exemption Under Minnesota Law*

■ Minnesota's homestead exemption statute provides:

"The house owned *and occupied* by a debtor *as the debtor's dwelling place,* together with the land upon which it is situated to the amount of area and value hereinafter limited and defined, shall constitute the homestead of such debtor and the debtor's family, and be exempt from seizure or sale under legal process on account of any debt not lawfully charged thereon in writing, except such as are incurred for work or materials furnished in the construction, repair, or improvement of such homestead, or for services performed by laborers or servants and as is provided in section 550.175."